No. 55,667

MELBA JEANNE DIVINE, as Guardian and Conservator of The Estate of JAMES L. WINFREE, *Appellant and Cross-Appellee,* v. MAX E. GROSHONG AND LIBERTY MUTUAL INSURANCE COMPANY, *Appellees and Cross-Appellants.*

(679 P.2d 700)

Opinion filed March 24, 1984.

*Richard N. Roe,* of Lowe, Terry & Roberts, of Olathe, argued the cause, and *Richard L. Roberts,* of the same firm, was with him on the briefs for appellant/cross-appellee.

*Richard T. Merker,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Leonard J. Schapker,* of the same firm, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

MILLER, J.: The plaintiff, Melba Jeanne Divine, guardian and conservator of James L. Winfree, appeals from the judgment entered in the District Court of Johnson County upon the verdict returned by a jury in this personal injury action. The collision out of which this action arose occurred on October 2, 1981. A pickup

truck being driven by Winfree collided with a disabled truck being towed by defendant Max Groshong. Winfree sustained serious injuries. Groshong was operating under authority granted by the Kansas Corporation Commission, and defendant Liberty Mutual Insurance Company had issued a "filed policy" of liability insurance to Groshong. See K.S.A. 1983 Supp. 66-1,128. The primary issue is whether the results of a blood alcohol test, administered to Winfree, were admissible in evidence.

The facts of the collision are clear and relatively undisputed. U.S. Highway 169 runs in a north-south direction at the south edge of Olathe. It is a four-lane road, with a large medial strip dividing the two northbound from the two southbound lanes. Interstate Highway 35, also a divided four-lane highway, runs in an east-west direction at the south edge of Olathe, and through traffic on I-35 passes under U.S. 169. On October 2, 1981, at about 11:30 o'clock p.m., Max Groshong was towing a disabled truck behind his 1971 Kenworth wrecker. The disabled truck weighed about ten tons. Groshong, proceeding westerly on I-35, took the exit ramp to his right and approached U.S. 169 from the east. He stopped at a stop sign, waited until a southbound vehicle had passed, and then looked to the south. Seeing no vehicles approaching, he entered the intersection. The intersection was unlighted but there were many lights on the wrecker and at least two lights on the left or south side of the disabled truck. When the Kenworth was through the intersection and heading to the south, Groshong saw a vehicle coming over the top of the overpass. He did not see it slow or change lanes, and he did not hear any noise indicating that the brakes were being applied. The northbound vehicle, a Toyota pickup driven by Winfree, struck just in front of the left rear dual wheels of the disabled truck. The collision occurred in about the middle of the northbound lanes on U.S. 169. The speed of Winfree's vehicle was estimated as being between forty-nine and sixty-four miles per hour. Only very faint scuff marks, indicating that Winfree was just starting to put on the brakes, were found. Police officers later did a "line of sight" test and determined that the accident scene and the two trucks were clearly visible from a point south of the overpass, 831 feet from the point of impact.

Winfree's pickup was demolished and he was pinned inside.

He was knocked unconscious and remained in a coma for over two months. Groshong, police officers and health service personnel attended Winfree, and several of these people noted the odor of alcohol about him. The odor was described as "moderate to strong," "strong," and "obvious." After Winfree was freed from the wreckage, he was taken by ambulance to the Olathe Community Hospital. Detective Melvin Richey, who was at the scene, was asked by the officer in charge to follow Winfree to the hospital for the purpose of collecting a blood sample. Detective Richey followed the ambulance to the hospital, asked one of the hospital employees to extract a blood sample from Winfree, and stood by while the hospital employee drew the blood in his presence. The sample was packaged, sealed, and mailed to a laboratory in Topeka for examination. Test results indicated that Winfree's blood contained .15% alcohol by weight. Detective Richey testified that, though Winfree was unconscious, he placed him under arrest for driving while under the influence of alcohol, and that Winfree was in his custody when the sample was taken. Richey did not tell Winfree or anyone at the hospital of the arrest. Winfree was later taken to another hospital, remained in a coma, and was declared incompetent by the District Court of Johnson County before he was released from the hospital. No formal charges were ever filed against him. The trial judge, after hearing the evidence out of the presence of the jury, found that Winfree "was under arrest or was otherwise in custody" when the blood sample was taken, and he admitted the results of the test in evidence. The jury attributed 70% of the fault to Winfree, 30% to Groshong. Judgment was entered for the defendants, and plaintiff appeals.

Plaintiff contends that the results of the blood alcohol test were inadmissible and should have been excluded in this civil action for two reasons: (1) they were not obtained in conformity with K.S.A. 1981 Supp. 8-1001; and (2) they were taken in violation of Winfree's Fourth Amendment rights. Plaintiff argues that the trial court's finding that Winfree was under arrest or otherwise in custody is not supported by competent evidence and is erroneous as a matter of law. Plaintiff also argues that the taking of blood for the purpose of analysis, from the person of one who is unconscious at the time, constitutes a violation of his constitutional rights.

K.S.A. 60-407 is our basic evidence rule. It provides that "[e]xcept as otherwise provided by statute . . . all relevant evidence is admissible." The Advisory Committee Notes state:

"This rule wipes out all existing restrictions and privileges and limitations on the admissibility of relevant evidence. They are then reinstated by subsequent sections insofar as desirable. This is necessary if a complete and orderly code is presented as to form and contents.

"This section presents the basic rule. All provisions that follow, except the few touching upon related matters or procedure, are exceptions to this rule in the form of limitations or modifications."

1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-407, Advisory Committee Notes to Laws of 1963 p. 75 (1979).

Judge Gard, commenting on this section in his Kansas Code of Civil Procedure 2d Annotated, says:

"No court decision has stated the rule so pointedly as does this provision, but the decisions are not in conflict with the policy of it. It simply recognizes the fundamental principle that the primary test of admissibility of evidence is its relevancy to the issue being investigated; and that the trier of the fact should have all of the relevant evidence which is offered unless some overriding consideration of policy or expediency requires its exculsion." pp. 75-76.

Judge Gard goes on to say:

"Constitutional considerations cannot be affected by these rules. For example illegally obtained evidence may be inadmissible on constitutional grounds, but not because it is irrelevant. Any constitutional questions which may arise are inherent and may, of course, be raised independently of this rule. The constitutions, federal and state, contain their own rules. To whatever extent the rules stated in this section violate in their application any constitutional right the constitutional consideration would be prevailing." p. 77.

We start with the premise that the evidence, if relevant, is admissible. This is true unless some statute or constitutional provision mandates its exclusion. The challenged evidence, the result of the blood alcohol test, is relevant evidence on the issue of Winfree's negligence. See *Townsend, Administrator v. Jones,* 183 Kan. 543, 331 P.2d 890 (1958); *Rhoades v. Atchison, T. & S. F. Rly. Co.,* 121 Kan. 324, 246 Pac. 994 (1926); *McIntosh v. Oil Co.,* 89 Kan. 289, 131 Pac. 151 (1913). The issue before us is not whether the evidence was relevant, but rather whether it should have been excluded for the reasons asserted. A general rule is set forth in 31A C.J.S., Evidence § 187, as follows:

"While there is some authority to the contrary, it has been held that evidence obtained fraudulently, wrongfully, or illegally ordinarily is not incompetent,

unless it is rendered incompetent as a result of constitutional or statutory regulations.

"The courts do not concern themselves with the method by which a party has secured the evidence which he adduces in support of his contentions; and hence, in the absence of constitutional or statutory restrictions, evidence which is otherwise admissible will not be excluded because it has been obtained fraudulently, wrongfully, or illegally."

K.S.A. 1981 Supp. 8-1001, applicable at the time of the injury in this case, reads in part as follows:

"Any person who operates a motor vehicle upon a public highway in this state shall be deemed to have given consent to submit to a chemical test of breath or blood, for the purpose of determining the alcoholic content of his or her blood whenever he or she shall be arrested or otherwise taken into custody for any offense involving operating a motor vehicle under the influence of intoxicating liquor in violation of a state statute or a city ordinance and the arresting officer has reasonable grounds to believe that prior to arrest the person was driving under the influence of intoxicating liquor. The test shall be administered at the direction of the arresting officer."

The statute, as will be seen, makes no provision for the taking of a blood sample from a person who is unconscious. In a criminal case, *State v. Garner*, 227 Kan. 566, 608 P.2d 1321 (1980), the defendant was charged with driving while under the influence of alcohol. When arrested, he appeared dazed and heavily intoxicated. He readily consented to a breath test, but later testified that he remembered nothing about being stopped, arrested, questioned, nor did he remember the taking of the test. The sole issue before us was whether the trial court erred in suppressing the results of the test because the defendant, an incapacitated driver, was physically unable to freely and voluntarily refuse the request. We discussed cases from other jurisdictions having similar statutes, the constitutional questions raised, and the applicable decisions of the United States Supreme Court. We found that the test was properly taken and the results were admissible. In so holding we said:

"The objectives of the statute are necessary and proper within the police power of the state. After the statute gives implied consent, it provides 'if the person so arrested refuses a request to submit to a test of breath or blood, it shall not be given . . . .' What effect does this statute giving implied consent with right of refusal have on an unconscious driver? We have seen the statute is more restrictive than the constitution. The statute requires an accused to be given the right to refuse the test and states the test shall not be given if refused. The constitution permits the taking of a blood or breath test as an incident to arrest,

regardless of refusal under the conditions discussed above. *If the unconscious driver, who is not mentioned in K.S.A. 1979 Supp. 8-1001, is exempt from the statute, then the evidence is clearly not rendered constitutionally inadmissible.*

"We find, however, notwithstanding the absence of constitutional inhibitions, the evidence is admissible pursuant to the statute itself. K.S.A. 1979 Supp. 8-1001 provides the operator of a vehicle on the highway is deemed to have consented to the blood or breath test for the privilege of driving. We find the unconscious driver is included in this classification and has consented to the test. The provision in 8-1001(*c*) permitting an operator to refuse is not a right of refusal, but was included in the statute as a means to avoid the violence which would often attend forcible tests upon a rebellious drunk, and the operator may withdraw that consent by expressly refusing the test. If he fails to expressly refuse, the consent remains in force and the test may be made. See *Mills v. Swanson,* 93 Idaho 279. To hold otherwise would permit the worst offender, the passed-out drunk, to escape the provision of the statute by his own voluntary act." (Emphasis supplied.) 227 Kan. at 571-72.

In *State v. Parson,* 226 Kan. 491, 601 P.2d 680 (1979), the defendant was convicted of involuntary manslaughter stemming from an automobile accident. He appealed, contending that the results of a blood alcohol test were improperly received in evidence. Parson had been taken from the accident scene to a Wichita hospital. He was unconscious. The record does not indicate that he was arrested, that he was given the option of refusing the test, or that the test was taken under the direction of a police officer. Instead, an emergency room physician ordered several tests, including a blood alcohol test. We said: "The blood alcohol test showed appellant's blood alcohol level to be 0.14, indicating intoxication pursuant to K.S.A. 8-1005(*b*)." 266 Kan. at 492. While the evidence was not attacked upon the grounds here urged, we held that the results of the tests were properly admitted into evidence.

Both parties cite *Williams v. Hendrickson,* 189 Kan. 673, 371 P.2d 188 (1962), a personal injury accident arising out of a motor vehicle collision. In that case, defendant gave his written consent to the sheriff to have his blood tested for alcoholic content. Blood was withdrawn and tested, and disclosed an alcoholic content of 0.168% by weight. A physician testified that such a blood alcohol percentage demonstrates drunkenness. Defendant challenged the admissibility of this evidence. We said:

"Defendant next contends that the result of the blood test was inadmissible in evidence for the reason that it was given under the provisions of G.S. 1961 Supp., 8-1001, and its admissibility is limited to criminal actions. The language of the

statute imposes no limitations in the use of the blood alcohol test to criminal actions. *We are of the opinion such evidence, if properly obtained and accurately identified, may be admitted in a civil action where pertinent to the issues involved in the case."* (Emphasis supplied.) 189 Kan. at 676.

Appellant contends that by the language "if properly obtained," we meant that the testing must be done in full compliance with K.S.A. 1981 Supp. 8-1001, and rationalizes that when there is not full compliance with the statute, the results would be inadmissible in both criminal and civil cases. The last sentence quoted above indicates merely that the foundational requirements for a reliable test must be met in order for the evidence to be admissible in a civil action.

In the case now before us the trial court, after hearing the evidence out of the presence of the jury, made a finding of fact that Winfree was arrested or otherwise in custody when the blood sample was taken and thus concluded that the sample was taken in compliance with K.S.A. 1981 Supp. 8-1001. There was evidence to support such a finding. However, we hold that the taking of a blood test in compliance with that statute is immaterial when considering the admissibility of blood test results in a civil negligence case. If the blood sample is taken under appropriate conditions to guard against contamination, if the sample is properly marked and conveyed to the laboratory, if the chemical testing is properly conducted by competent personnel, and if the test results are relevant and material to the issues presented in the litigation, then those results are admissible in a civil action whether or not they are taken in conformity with the statute. Blood test evidence, when otherwise competent, material and relevant, ought not to be excluded in a civil action solely because of the failure of a non-party—the police officer—to comply with 8-1001.

Turning to plaintiff's claim that the taking of the blood sample constituted an unreasonable search and seizure in violation of the Fourth Amendment, we conclude that the evidence ought not to be excluded upon those grounds. First, the blood sample was taken at the direction of a police officer at a time when the officer, under the evidence now before us, had probable cause to arrest Winfree on a charge of driving while under the influence of alcohol. The trial court found that Winfree was under arrest or in custody. Certainly the officer was exercising sufficient control over Winfree's person at the time to require the taking of the

blood sample, which supports the trial court's finding. Thus, seizure of the blood was permissible under our implied consent statute which satisfies Fourth Amendment requirements. Secondly, the primary purpose of the exclusionary rule is undoubtedly the deterrence of unlawful police conduct. In *United States v. Calandra,* 414 U.S. 338, 347-348, 38 L.Ed.2d 561, 94 S.Ct. 613 (1974), the court said:

"The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim:

'[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.' *Linkletter v. Walker,* 381 U.S. 618, 637 (1965). Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effecuate the guarantee of the Fourth Amendment against unreasonable searches and seizures:

'The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' *Elkins v. United States,* 364 U.S. 206, 217 (1960).

Accord, *Mapp v. Ohio,* [367 U.S. 643 (1961)], at 656; *Tehan v. Shott,* 382 U.S. 406, 416 (1966); *Terry v. Ohio,* 392 U.S. 1, 29 (1968). In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. The balancing process implicit in this approach is expressed in the contours of the standing requirement. Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. *Brown v. United States,* 411 U.S. 223 (1973); *Alderman v. United States,* 394 U.S. 165 (1969); *Wong Sun v. United States,* [371 U.S. 471 (1963)]; *Jones v. United States,* 362 U.S. 257 (1960). This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search."

Here, there is no contention that there was any connivance between the defendants in this case and the police officer who directed the taking of the blood sample. The police officer and the State of Kansas are not parties to this action. Suppression of blood test evidence in this case would have no deterrent effect upon law enforcement officers. We see no reason to extend the exclusionary rule to civil cases in which neither the State nor its officers are parties. The officer in this case was acting pursuant to

valid statutory law and the "seizure" was not unlawful. Clearly, deterrence is not required.

The admissibility of illegally or unconstitutionally seized evidence in civil trials has been the subject of much comment. See Annot., Admissibility, in Civil Case, of Evidence Obtained by Unlawful Search and Seizure, 5 A.L.R.3d 670; Note, *Constitutional Exclusion of Evidence in Civil Litigation*, 55 Va. L. Rev. 1484 (1969); Hanscom, *Admissibility of Illegally Seized Evidence in Civil Cases: Could This Be the Path Out of the Labyrinth of the Exclusionary Rule?* 9 Pepperdine L. Rev. 799 (1982); Note, *Admissibility of Illegally Seized Evidence in Subsequent Civil Proceedings: Focusing on Motive to Determine Deterrence*, 51 Fordham L. Rev. 1019 (1983). The vast majority of civil cases in which the exclusionary rule has been applied are those in which the state or the government, or agents thereof, are parties to the action. With this qualification in mind, we recognize that there is a split of authority on the admissibility of blood alcohol tests in personal injury accidents where the original seizure of the blood by law enforcement officers was illegal. In deciding which line of authority to follow, we have kept in mind that alcohol-related motor vehicle accidents often produce deceased, unconscious or other noncommunicative persons. Usually there are but few witnesses. We think the better rule is to permit the admission into evidence of blood test results, regardless of the lawfulness of the taking, in civil cases in which neither the State nor any of its officers is a party. The exclusionary rule should not be exercised in such instances. The trial court did not err in admitting the blood test evidence in this case.

Plaintiff next contends that the trial court erred in instructing the jury as follows:

### "INSTRUCTION NO. 12

"The laws of Kansas provide that if there was at the time of the accident 0.10 per cent or more by weight of alcohol in a driver's blood, it shall be presumed that the driver was under the influence of intoxicating liquor. This presumption is not conclusive but can be considered by you along with all the other evidence presented in the case in determining whether the driver was under the influence of alcohol."

This instruction is derived from K.S.A. 1981 Supp. 8-1005, which reads as follows:

"In any criminal prosecution for violation of the laws of this state relating to driving of a motor vehicle while under the influence of intoxicating liquor . . . evidence of the amount of alcohol in the defendant's blood at the time alleged, as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance may be admitted and shall give rise to the following presumptions:

"(1) If there was at that time less than 0.10 percent by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

"(2) If there was at the time 0.10 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor."

Plaintiff objected to the instruction on the ground that the statute and thus the presumption were applicable only in criminal proceedings, and plaintiff urges that same ground on appeal. On its face, the statute applies in criminal cases. However, it creates a rebuttable presumption of fact, one reasonably arising on the basis of the test results in evidence, and one equally applicable in civil or criminal proceedings when a person's intoxication or sobriety is in issue. Although not involving the instructions to a jury, our opinions in two civil cases have mentioned the application of the presumption. *Schmidt v. Jensen Motors, Inc.,* 208 Kan. 182, 490 P.2d 383 (1971), and *Johnson, Administrator v. Huskey,* 186 Kan. 282, 350 P.2d 14 (1960).

*Jensen* was a workmen's compensation case. The employer and its insurance carrier appealed from an award of compensation entered in favor of the widow and minor children of Bernard Schmidt. A one-car crash occurring about 6:30 p.m. was the immediate cause of death. There was evidence that an hour before the accident, the deceased had called on a prospect and that he had not been drinking at that time. However, an analysis of a blood sample taken by the mortician at the request of a highway patrol trooper showed a blood alcohol content of .162% by weight. A chemist and a highway patrol trooper both testified that someone with such a blood alcohol level would be under the influence of alcohol. The examiner, the director of workmen's compensation, and the district court found that Schmidt's death did not result "solely from his intoxication," and thus compensation was not barred by K.S.A. 1970 Supp. 44-501(b). We affirmed. In discussing the duties of the trial court in such a case, we said:

"In arriving at its findings in this case, the court was required to examine and take into consideration all the evidence introduced, that of the claimants as well as that of the respondents, giving such weight to the several parts of the evidence as, in its judgment, they seemed to merit. In evaluating the force and effect of the statutory presumption of intoxication set out in 8-1005, the court was entitled to consider not only that it could be rebutted by other evidence . . . but also that the blood sample was drawn by a mortician, not by a physician or qualified medical technician as K.S.A. 8-1003 requires . . . . .

"We believe the evidence taken in its entirety is sufficient to sustain the court's finding . . . ." 208 Kan. at 186.

*Johnson* was an action for the wrongful death of a young woman who was riding as a passenger in an automobile driven by the defendant. Plaintiff contended that the defendant's action in driving the car at least eighty miles per hour while intoxicated, losing control of the car, and causing it to go off the road and overturn in a field constituted gross and wanton negligence. A sample of defendant's blood had been taken with his consent and a test showed a result of 0.275% of alcohol by weight. A physician testified that a test of 0.15% would be evidence of intoxication and that considering defendant's test showed 0.275%, defendant was definitely under the influence of intoxicating liquor. We commented:

"The statute was not referred to in this case, but reference may be had to the provisions of G.S. Supp. 1957, 8-1005 in comparing the authenticity of the above testimony." 186 Kan. at 284.

We are aware that the courts of several states with statutes similar to K.S.A. 1981 Supp. 8-1005 have held the presumption applicable strictly according to its terms—in criminal cases only. See Annot., 16 A.L.R.3d 748, 757-58. At least one state, for a time, made evidence of blood alcohol test results and the presumption of intoxication admissible by statute in any civil or criminal trial arising out of the acts alleged to have been committed at the time the blood test was authorized. See Ala. Code, § 32-5-193 (1975), since repealed, and *Maffett v. Roberts*, 388 So. 2d 972 (Ala. 1980).

K.S.A. 1981 Supp. 8-1005 and its predecessors have been a part of the Kansas law since 1955, so for almost thirty years the presumption has been a part of our law. Originally, the presumption of intoxication arose only when the results of the blood alcohol test showed a level of 0.15% or more. See L. 1955, ch. 279, § 1. The statute was amended in 1970 and since that time

the presumption arises if the blood alcohol test discloses 0.10% or more by weight of alcohol in the blood. L. 1970, ch. 51, § 3. The statute was again amended in 1982 and now appears as K.S.A. 8-1005. Subsection (a)(2) of that statute makes it prima facie evidence that one was under the influence of alcohol to a degree that renders a person incapable of driving safely if blood, urine, breath or other bodily substance tests disclose 0.10% or more by weight of alcohol in the blood. Thus, the same presumption adopted in 1970 continues. No presumption arises if the percentage is less than 0.10%. The statutory presumption is based upon scientific principles. It would not be logical to have a presumption, based upon a given set of facts, that one was under the influence of alcohol to a degree that renders the person incapable of driving safely, in a criminal case but not in a civil case. The presumption is one arising upon certain facts and if those facts are shown by the evidence in either a civil or criminal case, the same presumption should arise. The presumption is a rule of evidence, applicable in civil, criminal or administrative proceedings. We hold that there is a rebuttable presumption in this state that a driver who at the time of an accident has 0.10% or more by weight of alcohol in his or her blood is under the influence of alcohol. The trial court did not err in so instructing the jury.

Plaintiff next contends that the trial court erred in giving a standard range-of-vision instruction, PIK Civ. 2d 8.02B, which reads as follows:

"It is the duty of a driver on a public highway to keep his vehicle under such control as will enable him to regulate his speed to his ability to stop or turn aside within the range of vision provided by the headlights of his automobile and thus avoid colliding with any other vehicle lawfully using the highway."

Plaintiff contends that the trial court should have modified the instruction to reflect at least some of the qualifications and exceptions included in the comments to the PIK instruction, applicable when there is a sudden change in the motorist's situation not caused by his own failure or neglect. Factors enumerated in the comment include:

"The color and condition of an offending vehicle parked in a traffic lane at night . . . the sudden emergence of blinding lights . . . a knoll, rise or change in grade causing the obstruction, motor vehicle or other object to be hidden . . . leaving an unlighted obstruction on the highway after it has turned dark . . . and the blending of an unlighted object with a street or general background . . . ." (Citations omitted.)

Plaintiff argues that the towed truck was blue in color on the bottom half and white on the top, that it blended with the road, and that the jury could have found that there were at best only two dim and weak lights on the side of the disabled vehicle facing Winfree as he approached. Plaintiff also contends that the wrecker and the towed truck were in the northbound lane an unusually long period of time because of their slow speed. These are all matters which could have been and no doubt were argued to the jury, but none of them appears to necessitate a modification of the instruction given. The towed truck was not "parked in a traffic lane"—it was moving slowly across the lane. There was no sudden emergence of blinding lights. While there was a grade and the point of impact was on the downslope, the evidence was undisputed that the wrecker and the towed vehicle were clearly visible from a point 831 feet to the south. The evidence as to the lights on the towed truck was that there were six flashing lights on the truck, at least two of them being on the side toward Winfree. These lights were still visible when the officers arrived, sometime after the collision. One of the officers testified that he did not see any flashing lights, but he did see the clearance lights on the disabled truck that were "quite bright." The disabled truck's battery ran down and the lights went out an hour and a half after the accident. There is no evidence that the lights were dim and weak or were not operating at the time of the accident. The speed of the trucks and the length of time they were in the northbound lanes was not a matter upon which the trial court could or should instruct. The trial court gave the usual range of vision instruction. Under the evidence, the court was not required to modify that statement of the law. The matter of the speed of the various vehicles, the color of the towed truck blending into the night scene, and the brightness of the lights on the disabled vehicle were matters for argument, not for instruction.

Finally, plaintiff contends that the trial court should have instructed that the tow truck was an authorized emergency vehicle required to be equipped with a rotating or oscillating light and that there are no restrictions on the use of a rotating light. The jury heard much evidence that the tow truck was equipped with an oscillating light and that the light was not in

use at the time of the collision, and it also heard testimony of an officer that he would have stopped the tow truck and asked the driver to turn off the light had he observed the light flashing while the vehicle was being towed. K.S.A. 8-1720 reads in part as follows:

"Every authorized emergency vehicle . . . shall be equipped with at least one rotating or oscillating light, which shall be mounted as high as practicable on such vehicle and which shall display to the front and rear of such vehicle a flashing red light or alternate flashes of red and white lights in combination."

The statute does not specify when emergency lights should be turned on. Groshong testified that he was not operating the truck as an emergency vehicle at the time of the accident. K.S.A. 8-1506 authorizes the driver of an authorized emergency vehicle responding to certain enumerated emergencies to disregard various traffic laws and regulations if the driver employs a siren or other audible signal and visual signals meeting the requirements of K.S.A. 8-1720. Considering these statutes together, it is apparent that audible and visual signals should be given and traffic regulations disregarded only when an emergency vehicle is acting in an emergency. An ambulance or fire truck being driven from one place to another and not answering an emergency call is not acting as an emergency vehicle. A tow truck at an accident scene and in the process of removing a disabled vehicle is acting as an emergency vehicle and should have its emergency warning lights in operation in order to warn all motorists approaching the scene. On the other hand, a tow truck driving down the road, even though towing a disabled vehicle from one place to another, is not acting as an emergency vehicle. We see no occasion for the use of the flashing, rotating or oscillating emergency lights in that situation. The tow truck is serving no greater purpose than the familiar transport pulling two trailers down the turnpike. We conclude that the trial court did not err in refusing the requested instruction.

We turn now to the cross-appeal. This case was tried in February 1983. On April 28, 1982, defendants filed an offer of judgment in the amount of $100,000. Plaintiff did not accept the offer. K.S.A. 60-2002 first provides for the service of an offer to allow judgment to be taken. Defendants complied with that portion of the statute. The statute then provides:

"If the judgment finally obtained by the offeree is not more favorable than the

offer, the offeree must pay *the costs incurred* after the making of the offer."
(Emphasis supplied.)

K.S.A.60-2003 enumerates the items which may be included in the taxation of the costs. These are:

"(1) The docket fee as provided for by K.S.A. 60-2001.

"(2) The mileage, fees, and other allowable expenses of the sheriff or other officer incurred in the service of process outside of this state or in effecting any of the provisional remedies authorized by this chapter.

"(3) Publisher's charges in effecting any publication of notices authorized by law.

"(4) Statutory fees and mileage of witnesses attending court or the taking of depositions used as evidence.

"(5) Reporter's or stenographic charges for the taking of depositions used as evidence.

"(6) Such other charges as are by statute authorized to be taxed as costs."

Defendants filed a motion for costs, attorney fees and expenses, and attached an affidavit itemizing these and showing a total expense of $8,909.67. The trial court found only $348.48 properly allowable as costs under K.S.A. 60-2003 and entered judgment for the defendant in that amount. Defendant claims this was error.

Defendants do not contend that there are any items properly taxable as costs under K.S.A. 60-2003 which the trial court did not allow. Instead, defendants sought to have taxed as costs all of its expenses in connection with this lawsuit after the making of the offer. These included paralegal time, attorney fees, deposition expense, phone calls, expert witness fees and the like. The term "costs" ordinarily means the fees and charges of the court—filing fees, fees for service of process and the like. K.S.A. 60-2002 does not provide for the payment of all of the *expenses* incurred by the opposing party after the making of the offer. The statute uses the term "costs," and the trial court allowed all items properly taxable as costs. We find no error.

Finally, defendants contend that they are entitled to their costs, attorney fees and expenses as a result of the plaintiff's denial of certain requests for admissions. These requests dealt with the extraction of blood from James L. Winfree, the testing of the blood sample, the results of the test, and whether Winfree was under the influence of alcohol or legally intoxicated at the time of the collision. The trial court denied defendants' motion and found that the plaintiff made a good faith argument against

the admission of the blood alcohol test results. An admission of the defendants' requests would have allowed the requested matters into evidence. This court has spent considerable time in this opinion deciding the issue of the admissibility of the blood test results and the applicability of the presumption. We agree with the trial court and find that the denials of the requests for admissions and the position taken by the plaintiff, though ultimately decided in defendants' favor, were not taken in bad faith or that they constituted the advancement of a frivolous position. Plaintiff was advancing a question of law which has ultimately been decided. Defendants argue that admissions are subject to all pertinent objections as to admissibility. See K.S.A. 60-236; Form 25, contained in the Appendix of Forms, Kansas Code of Civil Procedure Annot. 1963; 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-236, Comments (1979); and 8 Wright & Miller, Federal Practice and Procedure: Civil § 2264 (1970). Our proposed Form 25, like its federal counterpart, prefaces the request for admissions with the words "subject to all pertinent objections to admissibility which may be imposed at the trial." Defendants did not use that language in their request for admissions served in this case. Even so, we think that because of the legal issues involved, plaintiff "had reasonable ground to believe that [s]he might prevail on the matter . . . ." See K.S.A. 60-237(c). The trial court acted within its sound discretion in denying the motion.

The judgment is affirmed.