Argued and submitted March 4, Court of Appeals reversed, suppression order of circuit court reinstated and remanded to circuit court for further proceedings November 17, 1987

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# WILLIAM CALVIN TANNER,
*Petitioner on Review.*

## (TC 84-0973; CA A36777; SC S33523)

745 P2d 757

Raymond F. Thomas, Portland, argued the cause for petitioner on review. With him on the brief was Royce, Swanson & Thomas, Portland.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent on review.

LENT, J.

Campbell, J., concurred and filed an opinion.

Gillette, J., concurred in part, specially concurred in part and filed an opinion.

Peterson, C. J., dissented and filed an opinion.

Jones, J., dissented and filed an opinion.

**LENT, J.**

The issue is whether one who entrusts an effect to another has a right under Article I, section 9, of the Oregon Constitution against an unlawful search that discovers the effect.[1] We hold one does.

Defendant took video tapes and equipment from his employer's place of business and pledged them to Charles and Lori Best as collateral for a loan. Police officers, acting under an invalid warrant, discovered these items during a search of the Best residence. The discovery led to defendant's indictment for theft.

Defendant, relying on Article I, section 9, of the Oregon Constitution, moved to suppress evidence uncovered by the search. The circuit court granted the motion, concluding that defendant had "an expectation of privacy in the Best residence by virtue of the fact that the home was the repository of defendant's collateral." On the state's appeal from the suppression order, the Court of Appeals reversed. *State v. Tanner,* 82 Or App 296, 728 P2d 47 (1986). That court held that a "thief has no protected interest in stolen property." 82 Or App at 300. We allowed defendant's petition for review to consider the applicability of Article I, section 9, to effects entrusted to other persons.

## I.

In order to make clear the issue presented by this case, we note and emphasize several issues that are not presented.

First, there is no issue of the lawfulness of the search of the Best residence. The circuit court ruled that the warrant under which the search was conducted was invalid, and the state has not challenged that ruling on appeal. What the state does contend is that the evidence obtained should nonetheless have been admissible on the ground that the unlawful search did not violate the Article I, section 9, rights of defendant.

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

■     Unlike the Fourth Amendment exclusionary rule, which has been predicated in recent years on deterrence of police misconduct, *see, e.g., United States v. Leon,* 468 US 897, 905-08, 104 S Ct 3405, 82 L Ed 2d 677 (1984), the exclusionary rule of section 9 is predicated on the personal right of a criminal defendant to be free from an "unreasonable search, or seizure," *State v. Davis,* 295 Or 227, 231-37, 666 P2d 802 (1983); *State v. Laundy,* 103 Or 443, 494, 204 P 958, 206 P 290 (1922) (adopting the former Fourth Amendment rationale expressed in such early United States Supreme Court cases as *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914)).[2] That is, the search or seizure must violate the defen-

---

[2] Justice Jones's dissenting opinion argues that evidence obtained in violation of Article I, section 9, should be excluded in order to deter future violations of that section. This argument was rejected in *State v. Davis,* 295 Or 227, 231-37, 666 P2d 802 (1983). We have reexamined *Davis* in light of the dissenting opinion and again reject the argument for the reasons stated in *Davis.*

The argument of the dissenting opinion boils down to three points: (1) the U.S. Supreme Court *now* believes that deterrence is the foundation for the Fourth Amendment exclusionary rule; (2) other state courts have stated that deterrence is the foundation for "the" exclusionary rule; and (3) founding exclusion upon a constitutional right will undermine the exclusionary rule because the court might in the future conclude that "other remedies" would be adequate. The first point is indubitable but also irrelevant because this is an Article I, section 9, case, not a Fourth Amendment case. To be sure, *Davis* relied in part on *State v. Laundy,* 103 Or 443, 494, 204 P 958, 206 P 290 (1922), which adopted for Article I, section 9, the former Fourth Amendment exclusionary rule rationale expressed in such early U.S. Supreme Court decisions as *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914), but it is the dissenting opinion, not *Davis,* that misreads those cases. *See Weeks,* 232 US at 398; *Gouled v. United States,* 255 US 298, 312-13, 41 S Ct 261, 65 L Ed 647 (1921); *Silverthorne Lumber Co. v. United States,* 251 US 385, 391-92, 40 S Ct 182, 64 L Ed 319 (1920); Kamisar, *Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?,* 16 Creighton L Rev 565 (1983); Schrock & Welsh, *Up From Calandra: The Exclusionary Rule as a Constitutional Requirement,* 59 Minn L Rev 251 (1974).

As to the second point, the dissenting opinion's assertion that "the vast majority of the states * * * have stated that the rationale for the exclusionary rule is to deter police misconduct" is, in addition to being largely irrelevant, misleading because the dissenting opinion does not reveal that nearly all of the cases cited for that proposition, including the Oregon cases, were decided under the Fourth Amendment or using Fourth Amendment analysis. The dissenting opinion might as well have cited U.S. Court of Appeals cases.

As to the final point, the dissenting opinion confuses a constitutional right to exclude evidence obtained in violation of Article I, section 9, with a remedy for that violation. The constitutional right to exclude is not a remedy and for that reason cannot be replaced with an "adequate alternative," as the dissenting opinion states it fears.

In short, the dissenting opinion has not made any principled argument for adopting the deterrence rationale and has failed to come to grips with the fundamental

dant's section 9 rights before evidence obtained thereby will be suppressed; a defendant's section 9 rights are not violated merely by admitting evidence obtained in violation of section 9. The issue in this case thus is not whether the police violated section 9—that much is conceded—but whether the police violated defendant's section 9 rights.

Second, there is no issue of defendant's standing to challenge the unlawful search of the Best residence. A criminal defendant always has standing to challenge the admission of evidence introduced by the state. *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981). The question whether a defendant's personal rights were violated by an unlawful search or seizure is often mislabeled a question of "standing," but the question goes to the merits of a motion to suppress. The term "standing" should be used only in the narrow sense of capacity to make a legal challenge.

■      Third, although the Court of Appeals' decision was based on its conclusion that "a thief has no protected interest in stolen property," 82 Or App at 300, the character of the effects given by defendant to the Bests, and in particular whether they were stolen, is irrelevant in this instance. Searches and seizures are separate acts calling for separate analysis. *See State v. Owens,* 302 Or 196, 205-07, 729 P2d 524 (1986); *State v. Elkins,* 245 Or 279, 286-88, 422 P2d 250 (1966). The unlawfulness of which defendant complains was a search of the Best residence. If the police violated any right of defendant's, it was a right against the search that uncovered the effects, not some right in the effects themselves. An unlawful search that uncovers effects such as stolen goods or contraband, which also may not legally be possessed, will nevertheless result in suppression of those effects because the unlawfulness involves an infringement of rights apart from possessory interests (or the lack thereof) in the stolen goods or contraband seized as a consequence of the unlawful search. *See, e.g., State v. Kock,* 302 Or 29, 725 P2d 1285 (1986) (suppression of stolen goods seized during unlawful search of parked automobile); *State v. Perry,* 298 Or 21, 688 P2d 827

difficulties of that rationale, which this court has already noted in some detail in *Davis. See Davis,* 295 Or at 234-35 & nn 9-11.

(1984) (suppression of marijuana seized during illegal search of suitcase).[3]

## II.

■  The general issue that must be addressed in this case is whether the entrustment of an effect to another person is sufficient to establish an Article I, section 9, right against an unlawful search that uncovers the effect. For example, are the rights of a hotel guest who entrusts valuables to the hotel violated if the police unlawfully break into the hotel's safe where the valuables are stored? Are the rights of a person who loans a hunting rifle to another violated if the rifle is discovered during an unlawful search of the other person's automobile? If the general issue cannot be decided in the affirmative, there is no basis for defendant's contention that his section 9 rights were violated in the specific circumstances of this case.

Only two cases decided under section 9 have touched upon this issue. In the first case, *State v. Laundy, supra,* the defendant was convicted of criminal syndicalism for being a member of the Industrial Workers of the World (IWW). One of his assignments of error on appeal was the trial court's denial of his petition for the return of certain evidence, among which was an IWW songbook taken from the desk of one Myers. Myers' desk was across a large room from the defendant's desk, in an area subleased by an organization separate from the organization for whom the defendant worked. In disposing of this aspect of the defendant's assignment of error, the court stated, "If any articles were unlawfully taken from Myers' desk, the defendant cannot complain for the reason

---

[3] Even as to the effect itself, this court has recognized that section 9 protects possessory and property interests in contraband. *See, e.g., State v. Owens,* 302 Or 196, 207, 729 P2d 524 (1986); *State v. Elkins,* 245 Or 279, 290, 422 P2d 250 (1966). There is no occasion here to decide to what extent, if any, constitutionally protected interests in stolen property may differ from those in contraband. We do note, however, that the Court of Appeals' formulation of the issue raises a number of troubling procedural difficulties. Among the questions this court submitted to the parties were:

> "Does the [Court of Appeals'] analysis mean that the trial court must determine whether the defendant is guilty of theft before the court can rule on the defendant's motion to suppress items of evidence whenever the prosecution alleges that defendant stole the items? Must the court conduct a hearing adequate to find all elements of theft proven beyond a reasonable doubt? If not, what must be proved before the trial court can decline to suppress evidence on the ground that defendant cannot object to an unlawful seizure of the evidence?"

that if the right of any person was violated it was that of Myers or that of some other third person, and not that of the defendant." 103 Or at 498.

The opinion does not state whether the defendant had entrusted the songbook to Myers or had any other connection with it. At trial, the state had introduced the songbook into evidence, in order to establish the doctrines espoused by the IWW, not to show that the defendant was a member. Absent a connection between the songbook and the defendant, *Laundy* is not dispositive of the issue before us.

More relevant is *State v. Hoover,* 219 Or 288, 347 P2d 69 (1959). In *Hoover,* police officers stopped an automobile driven by the defendant after a report that the occupants had threatened someone with a gun. During the stop, one of the occupants whispered to an officer that the defendant had given the gun to his wife, who was sitting on it. The officer then reached into the car, pushed the woman aside and seized the gun. The defendant was subsequently charged with being a felon in possession of a firearm, and he moved for the return and suppression of the gun on the ground that it was obtained by the state in violation of section 9. This court stated:

> "The revolver was concealed by the device of having Mrs. Hoover [the defendant's wife] sit on it. Thus, we might easily dispose of the case by ruling that the search, if in fact unlawful, was a search of Mrs. Hoover's person and not of the automobile. Were this the case it would be her rights that were violated and the defendant would have no standing to make a complaint. *State v. Laundy,* supra. * * * However, since the revolver was lying on the car seat we think that the search was equally a search of the car and of Mrs. Hoover. Neither party has raised the line of argument we have just suggested, and we will treat the search as of the automobile alone."

219 Or at 296-97. Although the court's statement was dictum that amounted to an offhand suggestion, it is clearly on point if it retains any validity.

Both *Laundy* and *Hoover* were premised on the notion that section 9 interests are limited to possessory interests in a place searched or in a thing seized. In *Laundy,* the search of Myers' desk could only have infringed upon Myers' rights because only Myers was shown to have had a possessory interest in the desk. 103 Or at 498. Similarly, in *Hoover* the

search of Mrs. Hoover could only have infringed upon her rights because only she could have had a possessory interest in her body. 219 Or at 296-97. But the search of the automobile could have infringed upon the defendant's rights because, as the court went to some pains to point out, he was a bailee, which the court deemed to be "an interest of sufficient substance to fall within constitutional protection." *Id.* at 296. By implication, the search could not have infringed upon the defendant's rights if he had been a mere occupant and thus lacked a possessory interest in the automobile.

Since the decisions in *Laundy* and *Hoover,* however, this court has frequently recognized that section 9 interests are not limited to possessory interests in places or things. In *State v. Elkins, supra,* 245 Or at 288-92, the court noted three interests protected by section 9: privacy, property, and "some sort of a nebulous, poorly-defined right to be protected from undignified, forceable violations of the person," citing for the latter *Rochin v. California,* 342 US 165, 72 S Ct 205, 96 L Ed 183 (1952). The court's opinion was concerned with property interests against unlawful seizures, but the court identified privacy as the principal interest protected against unlawful searches, stating that the right of privacy had "recently been the subject of great emphasis." 245 Or at 289, 291. This was probably a reference to the then ongoing transformation of Fourth Amendment search jurisprudence from an analysis based on the protection of possessory interests in places to an analysis based on the protection of privacy interests, a transformation that was to culminate a few months later in *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967). *See* 1 LaFave, Search and Seizure § 2.1, at 302-05 (2d ed 1987); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn L Rev 349, 356-58, 381-83 (1974).[4]

---

[4] Prior to *Katz,* the Court's emphasis on the protection of possessory interests in places had led to absurd distinctions such as that between *Goldman v. United States,* 316 US 129, 62 S Ct 993, 86 L Ed 2d 1322 (1942), and *Clinton v. Virginia,* 377 US 158, 84 S Ct 1186, 12 L Ed 2d 213 (1964): In *Goldman,* the Court held that use of an electronic amplifying device placed against a party wall to eavesdrop on conversations in an adjacent office did not violate the Fourth Amendment rights of the tenant of the adjacent office; in *Clinton,* use of a similar device was held to violate the Fourth Amendment rights of the adjacent tenant because, unlike the device used in *Goldman,* this device was attached to the wall with a tack that trespassed into the adjacent space. The Court obliterated such distinctions in *Katz* by holding that electronic eavesdropping on a telephone conversation infringed upon interests protected by the Fourth Amendment because it "violated the privacy upon which [the speaker] justifiably relied" in using the telephone. 389 US at 353.

Subsequent opinions òf this court have continued to recognize privacy as one of the interests protected by section 9. *See, e.g., State v. Owens, supra,* 302 Or at 206; *State v. Louis,* 296 Or 57, 60-61, 672 P2d 708 (1983); *State v. Blackburn/ Barber,* 266 Or 28, 34, 511 P2d 381 (1973). In *Owens,* a search was explicitly defined in terms of privacy interests: "A 'search' occurs when a person's privacy interests are invaded." 302 Or at 206. We therefore do not regard this court's prior statements in *Laundy* and *Hoover* as helpful in resolving the issue before us.[5]

The extent to which actions by state officials are governed by section 9 is defined by the general privacy interests of "the people" rather than by the privacy interests of particular individuals.[6] Houses and telephone conversations, for example, are considered "private," and for that reason when police officers enter houses or eavesdrop on telephone conversations they must do so in conformity with section 9. Section 9 thus presents the police with a web of rules that are meant to protect the privacy interests of "the people," and the police violate section 9 if and only if they violate these rules. It cannot be otherwise, for the police cannot be expected to act on individual privacy interests, which they ordinarily have no means of ascertaining. The question of whose privacy rights have been violated is logically separate from the question whether section 9 has been violated.

---

[5] At first blush, the text of Article I, section 9, might seem to support the conclusion that section 9 protects only possessory interests. The Court of Appeals emphasized that section 9 protects "the right of the people to be secure in *their* persons, houses, papers, and effects." *State v. Tanner,* 82 Or App 296, 298 n 1, 728 P2d 47 (1986). The adjective "their," however, is plural, and its antecedent is "the people." The text is a directive to the state not to violate the security of the people by violating private "persons, houses, papers, and effects." If the protection of section 9 were textually limited to a person's own possessory interests, it would read: "the right of *a person* to be secure in *his* (or *her*) *person,* houses, papers, and effects" or "the right of the people to be secure in their *own* persons, houses, papers, and effects." Compare Article I, section 28: "No soldier shall * * * be quartered in any house, without the consent of *the owner,* * * *." (Emphasis added.) Once it is determined that the state has violated the security of the people's "persons, houses, papers, and effects," the question remains whose rights have been infringed by that violation. The text is not helpful on that score.

[6] Interests other than privacy are protected by section 9. *See State v. Owens, supra,* n 3, 302 Or at 206-07; *State v. Elkins, supra,* n 3, 245 Or at 288-92. Because privacy interests are the only section 9 interests implicated in this case, we refer only to those interests in the discussion.

It is not correct, then, to say that a warrantless search of A's house violated section 9 *because* it violated A's privacy interests in the house. It would be more accurate to say that the search of A's house violated section 9 because it violated the privacy of *the house*. Given that the police have violated the privacy of the house, the question then arises whether that violation has infringed upon anyone's privacy interests. If the house proves to be abandoned, the police may have violated section 9 without violating anyone's section 9 rights.

Residence in a house is uniformly deemed to be a sufficient basis for concluding that the violation of the privacy of the house violated the residents' privacy interests, but there is no reason to assume that the class of persons with privacy interests in a house is limited to residents. If A invites B to dinner at A's house and the police burst in on the dinner, it would be ludicrous to contend that the police have infringed upon a privacy interest of A but not upon a privacy interest of B. *Cf.* 4 LaFave, *supra,* § 11.3(b) (arguing that a dinner guest could reasonably expect the host's home to constitute a zone of privacy where the guest would be free from unreasonable governmental interference). On the other hand, B's interest in the privacy of the house would not be as extensive as that of A. An invitation to dinner would not necessarily give B an interest in the privacy of the basement. It may also be that if B were a trespasser, B would not have a recognizable privacy interest. *Cf. id.*

It is true that B, as a dinner guest, has no right to exclude the police (or anyone else) if A invites them in, but in that case the police have not violated section 9 at all. A section 9 privacy interest is an interest against the state; it is not an interest against private parties. *See State v. Blackburn/Barber, supra,* 266 Or at 34; *State v. Hilton,* 119 Or 441, 444-45, 249 P 1103 (1926). That A controls access to the house does not preclude B from asserting a privacy interest against the state if it violates the privacy of the house.[7]

---

[7] The argument that the absence of control over a place precludes a privacy interest in that place is based largely on the Supreme Court of the United States' Fourth Amendment "expectation of privacy" analysis. *See, e.g., Rawlings v. Kentucky,* 448 US 98, 105, 100 S Ct 2556, 65 L Ed 2d 633 (1980). This court employed that analysis in a case decided under the Fourth Amendment, *State v. Holt,* 291 Or 343, 630 P2d 854 (1981), but has never adopted it for analyzing section 9 privacy interests.

One difficulty with analyzing privacy interests in terms of "expectations" is that

Should the result be any different if, instead of inviting B to dinner, A allows B to store effects on A's premises? In both cases A has allowed B to make use of the privacy of A's house. The nature of what is shielded from unlawful searches is of no significance. Again, B's section 9 interests will not be violated if A allows the police to enter the house and discover the effects, but that is because A controls access to the house, not because B does not have a privacy interest against the state. And again, B's section 9 interests are only as extensive as A's explicit or implied permission to store the effect. B's privacy interests would not be violated by an illegal search of A's house to the extent that the search did not uncover the effects stored with A's permission. *Cf.* 4 LaFave, *supra,* § 11.3(c) (arguing that one who entrusts effects to another has a "justified expectation of privacy vis-a-vis those items").

The state argues that a person who entrusts effects to another can have no privacy interest against the discovery of the effects by the state unless the entrustor designates a particular place where the effects are to be kept. But the designation of a particular place has no relevance to the entrustor's privacy interests against the state. If B asks A to store an effect in A's bedroom closet and A stores it in a desk drawer, it cannot seriously be argued that B's privacy interest against the state is any less substantial. The state may no more invade A's desk than it may invade A's bedroom closet. The state perhaps fears that by failing to designate a specific location for storage, B will somehow gain a greater privacy interest, but, as noted above, this is not so. By entrusting an effect to A, B has made use of only so much privacy as protects the effect from

---

the issue is one of right, not expectation. Rights under section 9 are defined not by the privacy one expects but by the privacy one has a right to expect *from the government.* That access to an area is controlled by someone else makes it no less private with respect to an unlawful entry by the government. As Professor Amsterdam wrote in 1974, if subjective expectations were determinative of privacy rights, "the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television that 1984 was being advanced by a decade and that we were all forthwith being placed under comprehensive electronic surveillance." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn L Rev 349, 384 (1974).

Another somewhat related difficulty with the "expectations" approach is that it too easily confuses privacy with secrecy. A person who invites 100 guests to a private party at a private residence cannot reasonably expect much about the residence to remain secret. The residence is no less private, however. Uninvited persons may not enter, and the state may not enter without consent except under a properly authorized warrant or under exigent circumstances.

the state. If the police unlawfully enter a room in A's house in which an effect entrusted by B is stored, but do not discover the effect, B's privacy interests have not been harmed.

## III.

In general, then, the entrustment of an effect to another is sufficient to establish a privacy interest that is violated when the effect is discovered through an unlawful search. The final question is whether defendant had a privacy interest under the circumstances of this case.

The circuit court found that defendant gave the video tapes and equipment to Charles and Lori Best as security for a loan. Though we might have found different facts, there is evidence in the record to support this finding, so we are bound by it under the rule announced in *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968). *See also State v. Warner,* 284 Or 147, 156-59, 585 P2d 681 (1978).

Had the circuit court found that defendant had sold or given away the effects, that might have been a sufficient basis for concluding that defendant no longer had a privacy interest that could be violated by the discovery of the effects, *cf.* 4 LaFave, *supra,* § 11.3(c), at 305-06 & nn 116-17, but a person who pledges effects as collateral is in much the same position as one who entrusts effects to another for other purposes. The state contends that defendant had no immediate right of access to the tapes and equipment, but that fact alone does not preclude defendant's continuing entrustment of the effects. So long as there remained a possibility that defendant would reclaim the effects, the entrustment was sufficiently viable to demonstrate that the illegal search of the Best residence violated his privacy interests under section 9.

The decision of the Court of Appeals is reversed; the suppression order of the circuit court is reinstated. The case is remanded to the circuit court for further proceedings.

**CAMPBELL, J.,** concurring.

I concur with the majority opinion. In *State v. Davis,* 295 Or 227, 666 P2d 802 (1983) I joined in an opinion by then Associate Justice Peterson where he dissented in part and concurred in part. Among other things, he said:

"I also disassociate myself from the exclusionary rule discussion on pages 230-37 of the majority opinion. The basis for the majority's holding is that the defendant's constitutional rights were violated. The evidence therefore should be excluded. The discussion and holding beginning on page 231 with *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914), and ending on page 237 with *State v. Laundy,* 103 Or 443, 204 P 958, 206 P 290 (1922), is unnecessary."

295 Or at 257-58.

I still agree that the dictum on pages 230-37 of the *Davis* opinion was unnecessary. However, it was a correct statement of the law and for that reason I have no hesitation in joining the majority in this case.

**GILLETTE, J.,** concurring in part, specially concurring in part.

I join in the court's disposition of this case. I write separately only to disassociate myself—for the time being—from the "personal right" v. "deterrent" struggle into which this case has developed.

As to that struggle, I choose to remain a noncombatant. Justice Jones makes some good points when he questions the doctrinal antecedents of this Court's embarkation on the "personal right" journey in *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981). The Court may, as he suggests, have claimed more for *United States v. Salvucci,* 448 US 83, 100 S Ct 2547, 65 L Ed 2d 619 (1980), than the language and holding of that case justify. 304 Or at 330-31, 335-36 (Jones, J., dissenting). And, if his criticism is well taken, one also fairly can question the "personal right" language found in *State v. Davis,* 295 Or 227, 666 P2d 862 (1983), that relies on *McMurphy.*

But such an argument, even if well taken, does nothing to explain why the *concept* of a "personal right" enforceable under Oregon Constitution Article I, section 9, is not valid. For example, it does not explain why the specific language of that section, *viz., "the right of the people to be secure * * *,"* (emphasis supplied) is not significant. *Compare, e.g., State v. Henry,* 302 Or 510, 732 P2d 9 (1987) (opinion for a unanimous court by Jones, J.) (construing the phrase "on any subject whatever" in Or Const Art I, § 8).

If I were compelled to choose, I probably should

choose to take the *McMurphy/Davis* approach of the majority, at least over the deterrent approach of the dissent. I am more persuaded by the logic of the former. The vacillation and retraction in recent years in the United States Supreme Court's Fourth Amendment jurisprudence, leading to its inexplicable "good faith" exception to the exclusionary rule, *see United States v. Leon*, 468 US 897, 104 S Ct 3405, 82 L Ed 2d 677 (1984), satisfies me that the "deterrence" rationale does not vindicate adequately the interests to which Article I, section 9, speaks.

But I am not compelled to choose between competing doctrines at this juncture. In the first place, another theory—that it is the court's independent duty to enforce the constitution, and that admitting evidence improperly seized would be a separate constitutional violation *by the court*— deserves some thought. That aside, it seems to me that, even under its deterrence rationale, the dissent should agree on the outcome of this case. This defendant had placed goods for safekeeping in someone else's home. That house had, for search and seizure purposes, the same status as a storage vault, airport luggage locker or rented storage facility. "Title" to the property placed in any such location is irrelevant. Defendant would be protected even if the property he placed there was illicit drugs in which no one could have title.

When the police entered the house in this case without legal authority, the resulting search was no more permissible than would have been a similar illegal search of the other places just mentioned. Suppression should be required under Article I, section 9, even if our only purpose were deterrence—magistrates need to be deterred from issuing invalid warrants just as much as police officers need to be deterred from making invalid searches.

I concur.

**PETERSON, C. J.,** dissenting.

I join in the dissent of Jones, J., but wish to make these specific comments.

The exclusionary rule is a court-made sanction stemming from the right of persons to be free from unreasonable searches and seizures. The scope of the rule should be limited by its purpose.

The purpose of the rule is to deter unreasonable searches and seizures. "The rule is calculated to prevent, not to repair." *Elkins v. United States,* 364 US 206, 217, 80 S Ct 1437, 4 L Ed 2d 1669 (1960). I am fearful that the result of the majority's decision will be to exclude relevant evidence in situations where there is neither need nor justification for exclusion.

I am not sure that Jones, J., is correct in saying that the majority's approach will "[viscerate] the reason for an exclusionary rule" or "will lead to suggestions that the exclusionary rule should not operate when there are 'adequate' alternatives." 304 Or at 341. Except for that concern, I join in the dissent.

**JONES, J.,** dissenting.

I dissent. This is a case which raises the question whether, under Article 1, section 9, of the Oregon Constitution, an individual's proprietary rights under section 9 extend to objects an individual has stolen and then pledged to another to secure a loan.

The property in question was stolen by defendant from his employer and pledged to a third party to secure a loan. The employer's property was recovered during a raid of the third persons' home, where the property had been pledged. Defendant did not own that home, he did not live at that home, and he was not present at that home when it was searched or when the pledged property was seized by the police. The evidence seized should not have been suppressed.

Defendant's motion to suppress was based solely on Article I, section 9, and he concedes that he lacked a constitutionally protected interest in the property under federal authorities. *See, e.g., Rawlings v. Kentucky,* 448 US 98, 100 S Ct 2556, 65 L Ed 2d 633 (1980); *Rakas v. Illinois,* 439 US 128, 99 S Ct 421, 58 L Ed 2d 387 (1978). On the other hand, the state concedes that the search was conducted under an invalid warrant but contends that defendant's rights were not violated.

The trial court findings were both oral and written. After the motion to suppress hearing, from the bench the court made the following findings and conclusions:

"First of all, I've already spoken, I guess, as to a version of how I believe this all came to pass when Officer Scheeland was summoned to the house. We know there was a telephone call, I believe, to dispatch. Information was relayed to him that there had been a shooting at the residence. He went there and knocked on the door. There was no answer. He opened it and I believe my recollection is, he announced again who he was and there was a voice from inside, words to the effect that 'I've been shot.'

"He rushed in. Of course, from the radio communication, he had reason to believe that someone had been shot and that had been confirmed by the voice.

"He found Mr. Best, who had been shot. He found Mr. Best, I believe, on the floor. He found Mrs. Best seated in a chair, obviously bleeding from a wound.

"He had some brief word with her and she fell from a chair.

"Gun in hand, he went quickly through the house. In one room, I believe referred to as the southwest bedroom, he saw in plain view marijuana, a substantial quantity, and the Court believes it was in plain view and it was seen by him in that initial search. I'll call it a search, search for suspects and victims.

"That particular entry into the premises is permissible and not in violation of any statute in Oregon or the U.S. Constitution and what he saw was in plain view.

"Thereafter, other police officers arrived at the scene. What started out as an investigation for * * * an attempted murder, assault—analyzing blood samples, that sort of thing, went through a period of metamorphosis and became, frankly, a search for contraband, stolen property, and was in fact an impermissible crime scene search.

"Thereafter, a warrant, search warrant was obtained, first search warrant. Unfortunately, the probable cause was used in obtaining that search warrant; that is statements made by information given to Officer Vallery from other investigating officers was tainted by the illegal search that had been conducted and, therefore, the evidence that was seized, observed, whatever, as a result of that first search is to be suppressed.

"In that the second warrant is tied necessarily to the first * * * —anything that was seized, evidence that was obtained as a result of the second search is also to be suppressed.

"* * * * *

"The remaining issue has to do with standing, whether or

not Mr. Tanner can be heard to complain about this, what I've determined to be an illegal search and it's a pretty close question that hasn't really been—apparently hasn't been decided here in the State of Oregon.

"I can recall my analysis earlier and I think in questioning Ms. Burris when she said that she didn't believe he had any ground to complain at all, I kind of went through the analysis that I did here a few moments ago again and that's if one has property and sells or gives it to another person and that person has it in his house and it's contraband and it's discovered by an unlawful search, then the first person, the giver so to speak, has no grounds to complain later on.

"On the other hand, the opposite is also obvious and that is if one has contraband in their own house and it's discovered as a result of unlawful search then, obviously, you do.

"Here we have sort of a mixture involved. We have property and it's believable and I find for the purpose of analysis in this case that it was taken by Mr. Tanner from his employer and you can even go so far to say *it was impermissible taking,* not to be allowed. It was taken by him, given to the Bests, not permanently, but for the purpose of securing an indebtedness and that's what I've heard.

"We have to believe that had he not paid the debt, then they would have been allowed to keep it and so on. So in that respect, he has some rights akin to an owner in the property. He's taken it not by right of the owner and given it to another with the idea that the other, the creditor, is going to be able to keep it if the debt isn't paid. He certainly has an interest in that property. He has an interest in getting it back and replacing it so that he—so that it won't be discovered.

"You would have to believe under those circumstances that he has a continuing interest in the property and he has a continuing interest in its privacy; that is that the Bests aren't going to blab to everybody in town that he's taken it from his employer and that they have it and it's security for a loan or they are going to put it out on a sidewalk with a big sign saying, 'We are holding this property as security for an indebtedness.'

"He obviously has interest in the privacy of that; yet he has a private interest or an interest in protecting the privacy of that particular property and a belief that the Bests' residence where it's stored is also to be protected.

"It's not very artfully said, but it's a rough analysis and my way of saying that I think he does have an expectation of

privacy both in the Best residence, because it's a place, it's a depository of property that he still maintains some interest in.

"It's been left there at his will by his voluntary act and he obviously has an interest and expectation of privacy insofar as both personal property, the cassettes, recording equipment and the place where it's stored, the Best residence.

"Anyway, I think he does have standing. It may be a close question, but I think under an analysis that would be given by our Supreme Court, they would find that he does have the right of privacy insofar as the property." (Emphasis added.)

Subsequently, the court made written findings as follows:

"1. That defendant gave Charles and Lori Best *stolen property* from Tower Records as collateral for a loan;

"2. That the aforementioned property was seized pursuant to a search warrant executed on May 5, 1984 at the Best home;

"3. That the May 5 warrant was based upon information obtained during the execution of the search warrant at the Best home on May 2, 1984;

"4. That the May 2, 1984 warrant is invalid."

concluding:

"[1.] That the defendant Tanner has an expectation of privacy in the Best residence by virtue of the fact that the home was the repository of defendant's collateral;

"2. That defendant has an expectation of privacy in the property seized because, *although stolen,* he had pledged it as collateral;

"3. That as a result, defendant Tanner has standing to object to the search of the Best residence;

"4. That the property seized from the Best home on May 5, 1984 is ordered suppressed." (Emphasis added.)

The majority opinion contends that:

"Unlike the Fourth Amendment exclusionary rule, which has been predicated in recent years on deterrence of police misconduct, *see, e.g., United States v. Leon,* 468 US 897, 905-08, 104 S Ct 3405, 82 L Ed 2d 677 (1984), the exclusionary rule of section 9 is predicated on the personal right of a criminal defendant to be free from an 'unreasonable search, or seizure,' *State v. Davis,* 295 Or 227, 231-35, 666 P2d 802 (1984); *State v. Laundy,* 103 Or 443, 494, 204 P 958, 206 P 290 (1922) (in banc) (adopting the former Fourth Amendment rationale

expressed in such early U. S. Supreme Court cases as *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914)). That is, the search or seizure must violate the defendant's section 9 rights before evidence obtained thereby will be suppressed; a defendant's section 9 rights are not violated merely by admitting evidence obtained in violation of section 9. The issue in this case is thus not whether the police violated section 9—that much is conceded—but whether the police violated defendant's section 9 rights." 304 Or at 315-16 (footnote omitted).

and continues:

"* * * [T]here is no issue of defendant's standing to challenge the unlawful search of the Best residence. A criminal defendant always has standing to challenge the admission of evidence introduced by the state. *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981). The question whether a defendant's personal rights were violated by an unlawful search or seizure is often mislabeled a question of 'standing,' but the question goes to the merits of a motion to suppress. The term 'standing' should be used only in the narrow sense of capacity to make a legal challenge." *Id.*

concluding:

"* * * [A]lthough the Court of Appeals' decision was based on its conclusion that 'a thief has no protected interest in stolen property,' 82 Or App at 300, the character of the effects given by defendant to the Bests, and in particular whether they were stolen, is irrelevant in this instance. * * *" *Id.*

The majority, in asserting that the purpose of the exclusionary rule is to protect the personal rights of an accused, attempts to find a parallel between this holding and decisions of the United States Supreme Court. This attempt is predicated on pure *dictum* in *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981), where this court, in citing United States Supreme Court decisions, concluded:

"* * * [T]he deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself.

"This, at least, is the rule in the federal courts. *See United States v. Salvucci,* 448 US 83, 100 S Ct 2547, 65 L Ed 2d 619 (1980), tracing its antecedents. * * *" (Footnote omitted.)

The majority then cites *State v. Davis,* 295 Or 227, 666 P2d 862 (1983), for the same proposition. Again, the majority opinion in *Davis* starts out with an attempt to trace the purposes for the federal exclusionary rule as expressed in *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914), claiming that the purpose for the exclusionary rule as expressed in *Weeks* was to protect some personal right and that our early case of *State v. Laundy,* 103 Or 443, 204 P 958, 296 P 290 (1922), adopted the exclusionary rule for the same reasons as expressed by the United States Supreme Court in *Weeks.* This historical portrayal in *Davis* was inaccurate, being based on *McMurphy*'s faulty premise.

There is no language in *Weeks* that the exclusionary rule is predicated on the personal right of a criminal defendant to be free from an unreasonable search and seizure. In *Weeks* the defendant had petitioned for the return of papers seized in violation of the Fourth Amendment. The central holding of the case was that upon the defendant's motion the trial court should have returned all wrongfully seized papers. If the *Weeks* decision is to be seen as a discussion of how an individual's rights can be protected by the courts, the remedy created by this decision should be limited to the Supreme Court's order to return the wrongfully seized evidence.

On the question of the defendant's motion to exclude the evidence from the trial, the *Weeks* court had little to say. The only oblique reference to an exclusionary rule comes when the Court points out that:

"* * * The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures * * * should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

"* * * [T]he 4th Amendment was intended to secure the citizen in person and property against unlawful invasion of the sanctity of his home by officers of the law, acting under legislative or judicial sanction. This protection is equally extended to the action of the government and officers of the law acting under it. To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for

the protection of the people against such unauthorized action." *Weeks,* 232 US at 394.

I find the origins of the exclusionary rule in this discussion of the courts' duty to protect the rights of the people by refusing to sanction unlawful acts, and not in the separate question before the *Weeks* court concerning protecting an individual's rights by returning wrongfully seized property.

Prior interpretations of *Weeks* in Oregon have not offered different conclusions. There is no language in *State v. Laundy, supra,* that predicates the exclusionary rule of Article I, section 9, on a different interpretation of *Weeks.* Indeed, the *Laundy* court, citing *Weeks,* holds that whenever a defendant discovers that evidence is unlawfully seized "he is * * * entitled at that time to an order of the court directing a return of the property." *Laundy,* 103 Or at 494. While such an order, vindicating a defendant's rights, might have the same effect as contemporary courts' excluding without returning wrongfully seized evidence, such an order has a different purpose than does the alternative holding in *Weeks* establishing an exclusionary rule as a means to prevent the courts' sanctioning or encouraging unlawful police behavior.

The first announcement of the exclusionary rule in *Weeks* recognized that it was a necessary part of the guarantees of the Fourth Amendment. Nevertheless, the exclusionary rule did not spring fully formed from the mind of the Court. As with most other constitutional principles, it only gradually took on a fully defined form as it was defined and tested in different cases. The culmination of this development and refinement is the present deterrent rationale for the exclusionary rule. The Court, through the years of initial decisions, has come to recognize that each individual violation of constitutional rights must be made ineffective because to fail to do so would have the effect of encouraging further violations.

In none of the early opinions did the United States Supreme Court find the "personal rights" theory discovered by this court in *McMurphy* and *Davis,* nor did any of these cases expressly set forth any "deterrence" rationale for the exclusionary rule. As Yale Kamisar observes:

"In the thirty-five years following *Weeks* the Court had little

to say about the rationale of the exclusionary rule and absolutely nothing to say about the relative merits of the exclusionary rule and alternative methods of enforcing the fourth amendment. Often the Court remarked only that the evidence had to be excluded because it was obtained by violating rights secured to the defendant under the fourth and/or fifth amendments or because the use of the evidence would violate one or the other or both of these amendments. Sometimes the Court simply declared that a conviction based on evidence acquired by a violation of the fourth amendment 'cannot stand' or that the use of such evidence in a criminal prosecution cannot be 'tolerated under our constitutional system.' " Kamisar, *Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?*, 16 Creighton L Rev 565, 601-02 (1983) (footnotes omitted).

The so-called deterrence theory first surfaced on the federal level in *Wolf v. Colorado,* 338 US 25, 28, 93 L Ed 1782 (1949), where Justice Frankfurter first summarized *Weeks:*

"In *Weeks v. United States,* [*supra*], this Court held that in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. This ruling was made for the first time in 1914. It was not derived from the explicit requirements of the Fourth Amendment; it was not based on legislation expressing Congressional policy in the enforcement of the Constitution. The decision was a matter of judicial implication. * * *"

After this summary, the Court declared that the protections against unreasonable searches and seizures afforded by the Fourth Amendment were extended to the states by the Due Process Clause of the Fourteenth Amendment. The Court refused, however, to extend the exclusionary rule to the states as a part of the Due Process requirements of the Fourteenth Amendment. The reasoning of the Court gives an insight into the development of the deterrent theory and its strengths over a rationale based on individual rights:

"The jurisdictions which have rejected the *Weeks* doctrine have not left the right without other means of protection. Indeed, the exclusion of evidence is a remedy which directly serves only to protect those upon whose person or premises something incriminating has been found. We cannot, therefore, regard it as a departure from basic standards to remand those who emerge scathless from a search, to the remedies of private action and such protection as the internal discipline of the police, under the eyes of an alert public opinion, may

afford. Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective. * * *" *Id.* at 30-31.

Upon further examination the Court determined that focusing on the individual's other remedies did not serve to protect the public's interest in the Fourth Amendment. Not only did such other remedies fail to deter, they also did not preserve the basic freedoms protected by the Fourth Amendment.

In *Elkins v. United States,* 364 US 206, 217, 80 S Ct 1437, 4 L Ed 2d 1669 (1960), Justice Potter Stewart delivered the opinion of the Court, emphasizing that "[t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." In the landmark case of *Mapp v. Ohio,* 367 US 643, 815 S Ct 1684, 6 L Ed 2d 1081 (1961), Justice Clark, speaking for the Court, noted the contradiction contained in *Wolf.* The Court noted that the federal rule has been consistent since *Weeks.* "This Court has ever since required of federal law officers a strict adherence to that command which this Court has held to be a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to a 'form of words.' " *Id.* at 648 (quoting *Silverthorn Lumber Co. v. United States,* 251 US 385, 392, 40 S Ct 182, 64 L Ed 319 (1920)).

Because of this inconsistency, the *Mapp* Court overturned the part of *Wolf* which refused to apply the exclusionary rule to the states. "To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment. Only last year the Court itself recognized that the purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Id.* at 656 (quoting *Elkins*).

Again, in *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), Chief Justice Warren spoke for the Court,

stressing that "[e]ver since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. *See Weeks v. United States, [supra]*. Thus its major thrust is a deterrent one." *Id.* at 12.

To be sure, other reasons have been stated by the Supreme Court for the exclusionary rule, such as a reference in *Elkins* to protect "the imperative of judicial integrity," namely, that the courts not become "accomplices in the willful disobedience of a Constitution they are sworn to uphold." 364 US at 222, 223 (quoting *McNabb v. United States,* 318 US 332, 345, 63 S Ct 608, 87 L Ed 819 (1942)).[1] None of these cases can be read to suggest that one of several purposes of the exclusionary rule is predicated on a personal right of a criminal defendant to be free from an unreasonable search or seizure.

Indeed, the Court has explicitly rejected the idea that exclusion is necessary to prevent further violations of an individual's rights. In *United States v. Calandra,* 414 US 338, 354, 94 S Ct 613, 38 L Ed 2d 561 (1974), the Court stated that "[t]he wrong condemned is the unjustified governmental invasion of these areas of an individual's life. That wrong, committed in this case, is fully accomplished by the original search without probable cause." Subsequent use of the evidence "work[s] no new Fourth Amendment wrong." "In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.*

If taken out of the context of the case, some language in *United States v. Salvucci,* 448 US 83, 100 S Ct 2547, 65 L Ed 2d 619 (1980), might be interpreted to suggest that the exclusionary rule is a personal right. Because *Salvucci* was the case relied upon by this court in *McMurphy* as authority for converting the purpose of the exclusionary rule from its deterrent effect on others to a personal right of a defendant, a proper

---

[1] This same purpose is also recognized by the Court in *Mapp,* 367 US at 659, and *Terry,* 392 US at 12-13. A further purpose may be expressed by the dissent in *United States v. Calandra,* 414 US 338, 357, 94 S Ct 613, 38 L Ed 2d 561 (1974) (Brennan, J., dissenting), that "of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government."

view of that case is important. *Salvucci* concerned a defendant's opportunity to benefit from the operation of the exclusionary rule, what the United States Supreme Court refers to as "standing." It was in this context that the Supreme Court in *Salvucci* offered what is a small piece of historical *dictum* suggesting that "[t]he exclusionary rule is one form of remedy afforded for Fourth Amendment violations." 448 US at 86. Given the nature of *Salvucci,* this language should be read as a rather inartfully worded phrase in a discussion of a defendant's opportunity to benefit from the exclusionary rule, rather than the construction of a new and different justification for the exclusionary rule. The Court's focus in recent years, including the years that *McMurphy* and *Davis* were written, has been almost exclusively upon the deterrence function—and the majority opinion admits as much. 304 Or at 315.

In recent years, the debate concerning the exclusionary rule in the United Sates Supreme Court has been heated and wide-ranging. "Except for the unanimous decision written by Mr. Justice Day in *Weeks v. United States, [supra]*, the evolution of the exclusionary rule has been marked by sharp divisions in the Court. Indeed, *Wolf, Lustig [v. United States,* 338 US 74, 69 S Ct 1372, 93 L Ed 1819 (1949)], *Rochin [v. California,* 342 US 165, 72 S Ct 205, 96 L Ed 183 (1952)], *Irvine [v. California,* 347 US 128, 74 S Ct 381, 98 L Ed 561 (1954)], *Elkins, Mapp,* and *Calandra* produced a combined total of 27 separate opinions or statements." *United States v. Janis,* 428 US 433, 446 n 15, 96 S Ct 3021, 49 L Ed 2d 1046 (1976).

After much debate, the exclusionary rule has sharpened in focus because the Court has settled on the basic premise of the debate—that the purpose is primarily to deter or discourage governmental actions which violate constitutional rights. The debate has now concentrated on how best the Court can accomplish this purpose. This concentration has not been the result of the opinions of any one Justice, nor of one faction. All the members of the Court have recognized that the deterrent purpose of the rule is the beginning point of the Court's discussion and application of the rule. In addition to the examples given above, the following further illustrate this conclusion: *United States v. Leon,* 468 US 897, 916-17, 104 S Ct 3405, 82 L Ed 2d 677 (1984) (White, J.) ("the exclusionary rule is designed to deter police misconduct"); *United States v. Janis, supra* at 446 (Blackmun, J.) ("The Court,

however, has established that the 'prime purpose' of the rule, if not the sole one, 'is to deter future unlawful police conduct.' ").

The vast majority of the states which have addressed the purpose for the exclusionary rule have stated that the rationale for the exclusionary rule is to deter police misconduct. *See, e.g., Taylor v. State,* 399 S2d 881 (Ala 1981); *State v. Alfaro,* 127 Ariz 578, 623 P2d 8 (1981); *Harrington v. State,* 287 Ark 228, 697 SW2d 899 (1985); *Lockridge v. Superior Court,* 3 Cal 3d 166, 474 P2d 683, 89 Cal Rptr 731 (1970); *People v. Briggs,* 709 P2d 911 (Colo 1985); *State v. Zindros,* 456 A2d 288 (Conn 1983); *State v. Deputy,* 433 A2d 1040 (Del 1981); *State v. Le Croy,* 461 S2d 88 (Fla 1985); *People v. White,* 117 Ill 2d 194, 512 NE2d 677 (1987); *Gajdos v. State,* 462 NE2d 1017 (Ind 1984); *State v. King,* 256 NW2d 1 (Iowa 1977); *Divine v. Groshong,* 235 Kan 127, 679 P2d 700 (1984); *State v. Matthieu,* 506 S2d 1209 (La 1987); *State v. Bleyl,* 435 A2d 1349 (Me 1981); *Commonwealth v. Lahti,* 398 Mass 829, 501 NE2d 511 (1986); *People v. Chapman,* 425 Mich 245, 387 NW2d 835 (1986); *State v. Conaway,* 319 NW2d 35 (Minn 1982); *Stringer v. State,* 491 S2d 837 (Miss 1986); *State v. Poit,* 216 Neb 635, 344 NW2d 914 (1984); *Taylor v. State,* 547 P2d 674 (Nev 1976); *State v. Spero,* 117 NH 199, 371 A2d 1155 (1977); *Delguidice v. New Jersey Racing Comm.,* 100 NJ 79, 494 A2d 1007 (1985); *People v. Adams,* 53 NY2d 1, 422 NE2d 537, 439 NYS2d 877 (1981); *State v. Saavedra,* 396 NW2d 304 (ND 1986); *State v. Burkholder,* 12 Ohio St 3d 205, 466 NE2d 176, cert den 435 US 947 (1984); *Turner v. City of Lawton,* 733 P2d 375 (Okla 1986); *State v. von Bulow,* 475 A2d 995 (RI 1984); *State v. Sachs,* 264 SC 541, 216 SE2d 501 (1975); *State v. Habbena,* 372 NW2d 450 (SD 1985); *State v. Jennette,* 706 SW2d 614 (Tenn 1986); *Self v. State,* 709 SW2d 662 (Tex Crim App 1986); *State v. Harbaugh,* 132 Vt 569, 326 A2d 821 (1974); *Walls v. Commonwealth,* 2 Va App 639, 347 SE2d 175 (1986); *Fondren v. State,* 724 P2d 461 (Wyo 1986).[2]

---

[2] These cases are included here not because they are binding on this court but because they represent the independent reasoning of other courts. Unlike lower federal courts, the United States Supreme Court and these state supreme courts have the opportunity to examine the exclusionary rule without being bound by the holdings of a higher court. Whether these courts engaged in a review under their own constitutions or adopted the reasoning of other courts, their decisions are instructive because they are an indication that a majority of courts accept the deterrence rationale as an adequate justification for the exclusionary rule.

Other courts, or some of these same courts at different times, have announced that the exclusionary rule serves additional purposes, but not as a personal right of a criminal defendant. *State v. Malkin,* 722 P2d 943 (Alaska 1986) (deterrence and preservation of judicial integrity); *People v. Cahan,* 44 Cal 2d 434, 282 P2d 905 (1955) (deter and relieve the courts from being compelled to participate in such illegal conduct); *State v. Le Page,* 102 Idaho 387, 630 P2d 674 (1984) (has primary purposes of deterrence and preserving judicial integrity); *State v. Campbell,* 294 NW2d 803 (Iowa 1980) (to deter and to preserve judicial integrity); *State v Davis,* 375 S2d 69 (La 1979) (the concept that courts will not encourage, participate or condone illegal acts is a subordinate purpose to deterrence); *Commonwealth v. Lett,* 393 Mass 141, 470 NE2d 110 (1984) (deterrence, dissociation of the courts, and preclusion of benefit to prosecution); *State v. Bonds,* 98 Wash 2d 1, 653 P2d 1024, *cert den* 464 US 831 (1982) (rule has three purposes: to protect the privacy interests of the individual from unreasonable arrest, to deter police from unlawfully obtaining evidence, and to preserve the dignity of the judiciary).

In addition to *McMurphy* and *Davis* discussed by the majority, only two other courts have been discovered which suggest that the purpose of the exclusionary rule is to prevent the courts from violating the defendant's personal rights: *see State v. Johnson,* 716 P2d 1288 (Idaho 1986); and *State v. Coburn,* 530 P2d 442 (Mont 1974).

Contrary to the suggestion by the majority that the rationale for the exclusionary rule announced in *McMurphy* has been the law in Oregon since *Laundy,* there are numerous cases which recognize the deterrent purpose of the exclusionary rule under the Oregon Constitution. In *State v. Valentine/Darroch,* 264 Or 54, 67, 504 P2d 84, *cert den* 412 US 948 (1972), the defendants contended that the police violated their rights against unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution as well as under the Fourth and Fourteenth Amendments to the federal constitution. Justice Denecke, writing for the majority of the court, observed that "[t]he reason for the federal rule excluding evidence obtained in violation of the Federal Constitution was settled in *Linkletter v. Walker,* 38 US 618, 85 S Ct 1731, 14 L Ed 2d 601 (1965): '* * * the purpose was to deter the lawless action of the police and to effectively enforce the Fourth

Amendment.' " In answer to the defendants' attack, this court refused to take judicial notice that law enforcement officers were perniciously disobeying Oregon's knock and announce statute, and therefore implicitly found no need to exclude evidence based on a deterrence theory. In *State v. Nettles,* 287 Or 131, 597 P2d 1243 (1979), the defendant depended upon Article I, section 9, of the Oregon Constitution to challenge a police search and seizure. Justice Holman, writing for this court, quoted extensively from *United States v. Calandra, supra,* and cited other cases from the United States Supreme Court and the Ninth Circuit while holding that Oregon's exclusionary rule is "designed to deter future unlawful police conduct and that the rule was not for the purpose of compensating for the unlawful invasion of a person's privacy." In *State v. Quinn,* 290 Or 383, 397, 623 P2d 630 (1981), this court held that the federal rule was adequate for Oregon's purposes, citing *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). This court further held that "[t]he same policy is embodied in ORS 133.683, which allows such evidence if 'the court finds that exclusion of such evidence is not necessary to deter violations of' the search warrant statutes." In *State v. Holt,* 291 Or 343, 351, 630 P2d 854 (1981), this court stated that "[t]he purpose of exclusion is to deter unlawful police conduct by excluding evidence unlawfully obtained from the person against whom it is to be used."

Although in *State v. Valdez,* 277 Or 621, 629, 561 P2d 1006 (1977), the defendants argued that the search and seizure was a violation of ORS 131.615, this court did not limit its discussion of the exclusionary rule to the statute because

> "the purpose of the present statute is to protect interests of the kinds which are protected by the Fourth Amendment to the United States Constitution and by Art. I, [sec] 9, of the Oregon Constitution. So far the only practical method which has been devised to protect rights of this kind is the exclusion of the evidence which is the fruit of violation."

In deciding a defendant's rights under Article I, section 9, of the Oregon Constitution, this court in *State v. Warner,* 284 Or 147, 166, 585 P2d 681 (1978), cited *Valdez* as authority for suppressing the unconstitutionally seized evidence.

These decisions from Oregon and from other courts across the nation demonstrate that the exclusionary rule is

properly explained as a means to preserve the freedoms guaranteed by Article I, section 9, because it reduces or removes incentives to violate the restrictions of section 9.

It is true that talk of deterrence encourages some to think in terms of empirical evaluations of the exclusionary rule. To the extent that the term deterrence suggests that its advocates must prove actual instances where the police have not conducted a search or seizure because the evidence would be excluded, it is unfortunate that this term has become the short-cut means of expressing a rationale for the exclusionary rule which does not depend on an empirical demonstration of its validity. Allowing unconstitutionally seized evidence into court would be an incentive for the police to ignore the limitations of Article I, section 9, because it would tell them that these limitations have no practical effect.[3] The exclusion of this evidence is a disincentive to the police. The exclusionary rule does not depend on empirical proof that it prevents certain types of behavior. Each act of exclusion is a reaffirmation of the limits which section 9 imposes on law enforcement and, as such, serves as a message that future violations will be treated in the same manner.

The exclusionary rule preserves the principles of section 9 by inhibiting "[t]he tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures." *Weeks,* 232 US at 394. It is designed to protect society's interest by discouraging future violations of section 9. The majority and I agree that an individual's rights under section 9 deserve diligent protection by the courts of Oregon. However, because I feel that the exclusionary rule has an independent purpose for the courts and for society, I reject the majority's relegation of the exclusionary rule to a position as one of several ways that an individual can assert personal rights under section 9.

Insofar as the majority has looked to the decisions of the United States Supreme Court for parallels to justify Oregon's exclusionary rule, I believe they misread those cases.

---

[3] *See* Kamisar, *Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?,* 16 Creighton L Rev 565, 645 (1983).

Further, in fashioning a new justification for Oregon's exclusionary rule, I believe that the majority has done a disservice to the exclusionary rule by diluting its importance to the people of Oregon.

In attempting to justify the conclusion that the exclusionary rule protects a defendant's personal rights, the majority relies on *Weeks,* which contains no such language, as being adopted by this court in *Laundy,* which contains only a reference to *Weeks,* as the basis for the *dicta* found in *McMurphy* and adopted in *Davis.* The whole theory that Oregon's exclusionary rule is somehow predicated on a personal right of a defendant simply falls for lack of any foundation. Any opinion on the merits of this case should be based essentially on the deterrent theory of the exclusionary rule as opposed to a personal right. If the court wishes to pursue a "personal right" justification, it steps into the trap of viscerating the reason for an exclusionary rule. Personal rights may be vindicated with state or federal civil tort actions.

The majority confuses the violation of rights giving rise to the operation of the exclusionary rule with the purpose of the rule. Certainly the exclusionary rule becomes operative when a defendant's rights have been violated, but it is not designed as a defendant's remedy for that violation. If it is seen as a remedy for defendants, it will be too easy to suggest that because a defendant has other remedies society can dispense with the inconvenience of the exclusionary rule, at least in some particular case where it will not provide any effective relief for a given defendant.[4]

---

[4] For a preview of these arguments, see the suggestions in Chief Justice Burger's dissent in *Bivens v. Six Unknown Named Agents,* 403 US 388, 91 S Ct 1999, 29 L Ed 2d 619 (1971) (Burger, C. J., dissenting). For the problems with such suggestions and an affirmation of the value of the exclusionary rule as a deterrent, see 1 LaFave, Search and Seizure 31-43 (2d ed 1987).

Some recent critics of the deterrence theory have suggested that its proponents are actually secret opponents of the exclusionary rule. *See, e.g.,* Morris, *The Exclusionary Rule, Deterrence and Posner's Economic Analysis of Law,* 57 Wash L Rev 647, 650 (1982); Kamisar, *supra* n 2.

I question the suggestion that all advocates of a deterrence rationale seek to weaken the exclusionary rule, because I cannot see how, for example, *Mapp v. Ohio,* 367 US 643, 815 S Ct 1684, 6 L Ed 2d 1081 (1961), could be regarded as opposing the exclusionary rule because it stated that the exclusionary rule is a "deterrent safeguard." I think that a better explanation of why some current attacks on the exclusionary rule couch their attack in terms of deterrence is, that while the critics speak of

The intent of Article I, section 9, is to preserve individual rights by ensuring that police searches and seizures are subject to the prior approval of an independent magistrate. While I do not mean to imply that this result is intended, I am concerned that the majority's rationalization of the exclusionary rule will lead to suggestions that the exclusionary rule should not operate when there are "adequate" alternatives.

I reject the majority's "personal rights" purpose for the exclusionary rule and conclude that a defendant is, at best, an incidental beneficiary when exclusion occurs for the purpose of deterring the frequency of future violations. I have dwelt in detail on the question because of the majority's misinterpretation of prior Oregon caselaw and parallel federal decisions. I do not wish future courts to question the validity of the exclusionary rule because it is now based on a misreading of previous decisions. Because these prior decisions are at least subject to differing interpretations, I take the majority to be using these cases as illustrations which they read to be examples of the remedial character of the exclusionary rule in operation.

I now turn to the merits of this case. William Pitt, in his oft-quoted remarks, stated:

"The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement."[5]

This grand statement is equally applicable to people in this

---

deterrence, they do this only because that is the language they are forced to use.

In reality those who seek to discard the exclusionary rule are suggesting that the exclusionary rule is merely an easily discarded individual remedy by again raising the argument of alternative individual remedies which the United States Supreme Court rejected in *Mapp v. Ohio, supra.* Based on their practical experiences, other courts have also rested their acceptance of the deterrence rationale on the failure of these alternatives actually to serve as a protection of society's rights to be free of unreasonable searches and seizures. "So far the only practical method which has been devised to protect rights of this kind is the exclusion of the evidence which is the fruit of violation." *State v. Valdez,* 277 Or 621, 626, 561 P2d 1006 (1977); "[O]ther remedies have completely failed to secure compliance with the constitutional provisions." *People v. Cahan,* 44 Cal 2d 434, 282 P2d 905, 911 (1955).

[5] Parliamentary History 1401-03, Vol XV (Correspondence of William Pitt 288) (as quoted by Lasson, The History and Development of the Fourth Amendment to the United States Constitution 49-50 (1937)).

state being protected from oppressive governmental action. However, in this case, the third persons' house was not defendant's "cottage," the "government" did not enter defendant's premises and defendant did not own the property. In fact, as the trial judge found, defendant stole the property.

I agree that this defendant has "standing," as defined by the majority, to challenge this search and seizure. Along with the majority, I would depart from federal precedent, *e.g., Rawlings v. Kentucky, supra,* in holding that where a defendant with some legitimate claim to possession of property entrusts that property to another, that defendant retains a right against an unlawful search which uncovers the property.

I dissent because the facts in this case demonstrate that defendant did *not* have any protected interest in the things seized. If he had been the lawful owner of the property in question, but had bailed it or pledged it to the third persons, I agree that he would have a right to object to illegal governmental interference with his proprietary interest. Similarly, if he had kept stolen property in his own home, the government could not, without a valid warrant or exigent circumstances, enter his home to search for or seize the property because of his privacy and proprietary interest in his home. But the trial court found that defendant had stolen the property from his employer and pledged it to a third person who in turn stored it on premises where defendant had no proprietary or privacy right.

A thief has no privacy interest in stolen property. *State v. Quinn,* 290 Or 383, 393, 623 P2d 630 (1981); *Williams v. United States,* 323 F2d 90 (10th Cir 1963); *State v. Pokini,* 367 P2d 499 (Hawaii 1961); *Shope v. State,* 18 Md App 472, 307 A2d 730 (1973); *Palmer v. State,* 14 Md App 159, 286 A2d 572 (1972); *Slyter v. State,* 246 Miss 402, 149 S2d 489 (1963); *Harper v. State,* 84 Nev 233, 440 P2d 893 (1968); *State v. Edmonds,* 462 SW2d 782 (Mo 1971). *Cf. Cotton v. United States,* 371 F2d 385 (9th Cir 1967); *Simpson v. United States,* 346 F2d 291 (10th Cir 1965) (which, however, the United States Supreme Court labeled "inexplicable" decisions. *Rakas v. Illinois, supra,* 439 US at 141 n 9). Because defendant had no legitimate right to the property or to the premises where the property was seized, his rights under Article I, section 9, of the Oregon Constitution were not violated and the evidence was

improperly suppressed. I would not reverse the decision of the Court of Appeals.

Therefore, I reject any association with the majority which, in sum, tells the public that a thief can steal property from his employer, pledge it for money and, by placing it in the hands of a third party, then be allowed to claim that his own personal and property rights have been violated. To state the proposition is to refute it.